## UNITED STATES COURT OF INTERNATIONAL TRADE
Before: The Honorable Leo M. Gordon

| | |
|---|---|
| CSC SUGAR LLC,<br><br>          Plaintiff,<br><br>     v.<br><br>UNITED STATES,<br><br>          Defendant,<br><br>     and,<br><br>AMERICAN SUGAR COALITION, *et al.*,<br><br>          Defendant-Intervenors. | Court No. 17-00214 |

## ORDER GRANTING PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD UNDER C.I.T. RULE 56.2

Upon consideration of Plaintiff's Motion for Judgment on the Agency Record Under C.I.T. Rule 56.2 and the accompanying memorandum in support, and good cause appearing therefore, Plaintiff's Motion is hereby **GRANTED**.

The Court hereby vacates the U.S. Department of Commerce's final determination in this suspension agreement: *Sugar from Mexico: Amendment to the Agreement Suspending the Countervailing Duty Investigation*, 82 Fed. Reg. 31,942 (July 11, 2017) (P.R. 95), and hereby remands this determination to the U.S. Department of Commerce with instructions to take such further action as required by the Court's decision in this matter.

**SO ORDERED** this _____ day of _____, 2019.

_____
Judge Leo M. Gordon

**UNITED STATES COURT OF INTERNATIONAL TRADE**
Before: The Honorable Leo M. Gordon

| |
|---|
| CSC SUGAR LLC, |
| Plaintiff, |
| v. |
| UNITED STATES, |
| Defendant, |
| and, |
| AMERICAN SUGAR COALITION, *et al.*, |
| Intervenor Defendants. |

Court No. 17-00214

## PLAINTIFF'S MOTION FOR JUDGMENT
## ON THE AGENCY RECORD UNDER C.I.T. RULE 56.2

Plaintiff CSC Sugar LLC ("Plaintiff"), by and through its attorneys, hereby files its Motion for Judgment on the Agency Record Under C.I.T. Rule 56.2. For the reasons more fully described in Plaintiff's accompanying memorandum in support, Plaintiff respectfully requests that the Court grant judgment on the agency record in favor of Plaintiff and vacate the U.S. Department of Commerce's final determination in the suspension agreement *Sugar from Mexico: Amendment to the Agreement Suspending the Countervailing Duty Investigation*, 82 Fed. Reg. 31,942 (July 11, 2017) (P.R. 95).

Respectfully submitted,

January 18, 2019

Counsel for Plaintiff

Jeffrey S. Neeley
Michael Klebanov

Husch Blackwell LLP
750 17th Street, N.W.
Suite 900
Washington, D.C. 20006
(202) 378-2357
Jeffrey.neeley@huschblackwell.com

*Attorneys for CSC Sugar LLC*

### Certificate of Service

A true and accurate copy of the foregoing was electronically filed on January 18, 2019 via the Court's ECF filing system, which automatically serves notice on counsel of record.

_____
Jeffrey S. Neeley

## UNITED STATES COURT OF INTERNATIONAL TRADE

Before: The Honorable Leo M. Gordon

| | |
|---|---|
| CSC SUGAR LLC, | |
| Plaintiff, | |
| v. | No. 17-00214 |
| UNITED STATES, | **PUBLIC VERSION** |
| Defendant, | |
| and, | |
| AMERICAN SUGAR COALITION, *et al.*, | |
| Defendant-Intervenors. | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD UNDER C.I.T. RULE 56.2

Jeffrey S. Neeley
Michael Klebanov

HUSCH BLACKWELL LLP
750 17th Street, N.W.
Suite 900
Washington, DC 20006-4675

Attorneys for CSC Sugar LLC

January 18, 2019

# TABLE OF CONTENTS

**Page**

INTRODUCTION.............................................................................................. 1

RULE 56.2(c) STATEMENT ........................................................................... 2

I.   Administrative Determination Under Review............................................. 2

II.  Issues Presented ...................................................................................... 3

BACKGROUND .............................................................................................. 3

A.  Commerce Amends the Countervailing Duty Suspension Agreement on
    *Sugar from Mexico.* ................................................................................ 3

B.  The Record Contains Documentation of Selective *Ex Parte* Meetings. ......... 8

C.  The Record Omits Documentation of Several Other *Ex Parte* Meetings. ...... 9

D.  The Court Orders Commerce to Supplement the Record with
    Documentation of All *Ex Parte* Meetings, But Commerce Fails to Fully
    Comply with the Court's Order. ............................................................... 10

ARGUMENT ................................................................................................. 13

I.   The Court Should "Hold Unlawful" the Suspension Agreement and Grant
     CSC Sugar's Motion, Because Commerce Acted "Not in Accordance with
     Law."........................................................................................................ 13

     A.   The Act Requires Commerce to Maintain a Record of All *Ex
          Parte* Meetings. .............................................................................. 14

     B.   When It Failed to Maintain a Record of All *Ex Parte* Meetings,
          Commerce Acted "Not in Accordance with Law." ............................ 15

     C.   Commerce's Actions Frustrated the Act's Purpose. ........................ 20

     D.   Commerce's Actions Foreclose Effective Judicial Review. .............. 22

II.  As a Remedy, the Court Should Vacate the Suspension Agreement.......... 23

     A.   Because the Relevant Statutes and Regulation Are "Intended
          to Provide Important Procedural Benefits," the Court Must
          Vacate the Suspension Agreement Unless Commerce Shows
          Its Error Was Harmless. ................................................................ 23

B.    Commerce Cannot Show that Its Error Was Harmless. ................. 26

CONCLUSION ............................................................................................ 29

CERTIFICATE OF COMPLIANCE ................................................................ 31

CERTIFICATE OF SERVICE ........................................................................ 32

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Allina Health Servs. v. Sebelius,*
746 F.3d 1102 (D.C. Cir. 2014) ............................................................... 25

*Am. Friends Service Comm. v. Webster,*
720 F.2d 29 (D.C. Cir. 1983) .................................................................... 25

*Citizens for Responsibility & Ethics in Washington v. Pruitt,*
319 F. Supp. 3d 252 (D.D.C. 2018) .......................................................... 25

*F. Lli De Cecco Di Filippo Fara San Martino S.P.A. v. United States,*
980 F. Supp. 485 (Ct. Int'l Trade 1997)................................................ *passim*

*Sugar Cane Growers Co–op. of Fla.v. Veneman,*
289 F.3d 89 (D.C. Cir. 2002) ..................................................................... 26

*Guangdong Chemicals Imp. & Exp. Corp. v. United States,*
414 F. Supp. 2d 1300 (Ct. Int'l Trade 2006)........................................ 23, 24

*Home Box Office, Inc. v. F.C.C.,*
567 F.2d 9 (D.C. Cir. 1977) ...................................................................... 22

*Hoogovens Staal BV v. United States,*
4 F. Supp. 2d 1213 (Ct. Int'l Trade 1998)................................................. 22

*Intercargo Ins. Co. v. United States,*
83 F.3d 391 (Fed. Cir. 1996)...................................................................... 26

*Kao Hsing Chang Iron & Steel Corp. v. United States,*
140 F. Supp. 2d 1379 (Ct. Int'l Trade 2001)........................................ *passim*

*Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.,*
761 F.2d 649 (Fed. Cir. 1985)................................................................... 17

*Mid Continent Nail Corp. v. United States,*
846 F.3d 1364 (Fed. Cir. 2017).......................................................... 25, 26

*Miller & Co. v. United States,*
824 F.2d 961 (Fed. Cir. 1987).................................................................. 13

*Nippon Steel Corp. v. United States,*
118 F. Supp. 2d 1366 (Ct. Int'l Trade 2000), *rev'd on other grounds,*
337 F.3d 1373 (Fed. Cir. 2003).......................................................... *passim*

*Portland Audubon Social v. Endangered Species Comm.,*
984 F.2d 1534 (9th Cir. 1993) .................................................................. 24

*Linyi Bonn Flooring Mfg. Co. v. United States,*
222 F. Supp. 3d 1274 (Ct. Int'l Trade 2017)........................................ 26, 28

*U.S. Lines, Inc. v. Fed. Mar. Comm'n,*
584 F.2d 519 (D.C. Cir. 1978) ............................................................ 22, 29

*Valeo N. Am., Inc. v. United States,*
   277 F. Supp. 3d 1361 (Ct. Int'l Trade 2017) .................................. 13, 14, 20

*Wieland–Werke AG v. United States,*
   4 F. Supp. 2d 1207 (Ct. Int'l Trade 1998) ............................................ 21, 27

## STATUTORY AUTHORITIES

5 U.S.C. § 706(2) ........................................................................................ 25

19 U.S.C. § 1516a ............................................................................... *passim*

19 U.S.C. § 1677f .................................................................................*passim*

## RULES AND REGULATIONS

19 C.F.R. § 351.104 ............................................................................. *passim*

## LEGISLATIVE MATERIALS

S. Rep. 96-249, *Trade Agreements Act of 1979* (1979) ............................. *passim*

## ADDITIONAL AUTHORITIES

*Initiation of Antidumping and Countervailing Duty Administrative
   Reviews*, 81 Fed. Reg. 6,832 (Feb. 9, 2016) .................................... 4

*Sugar from Mexico*, Inv. Nos. 701-TA-513 and 731-TA-1249
   (Preliminary), USITC Pub. 4467 (May 2014). ................................. 3

*Sugar from Mexico: Amendment to the Agreement Suspending the
   Countervailing Duty Investigation*, 82 Fed. Reg. 31,942 (July 11, 2017) ..... 2, 7

*Sugar from Mexico: Final Affirmative Countervailing Duty Determination*,
   80 Fed. Reg. 57,337 (Sept. 23, 2015) ............................................ 4

*Sugar from Mexico: Preliminary Affirmative Countervailing Determination
   and Alignment of Final Countervailing Duty Determination with Final
   Antidumping Duty Determination*, 79 Fed. Reg. 51,956 (Sept. 2, 2014) ........... 4

*Sugar from Mexico: Suspension of Countervailing Duty Investigation*, 79
   Fed. Reg. 78,044 (Dec. 29, 2014) ................................................. 4

# INTRODUCTION

Congress designed the Tariff Act of 1930, as amended (the "Act"), to ensure transparency in, and reviewability of, antidumping and countervailing duty proceedings conducted by the U.S. Department of Commerce ("Commerce").  To that end, the Act and an implementing regulation obligate Commerce to create and maintain memoranda of *ex parte* meetings and to include those memoranda in the administrative record.  In this appeal, Commerce utterly failed to satisfy its statutory obligations and create a proper record.  This failure, which even Commerce has admitted, flouted this Court's authority by foreclosing effective judicial review.

Commerce recently amended the suspension agreement on the countervailing duty investigation in *Sugar from Mexico*.[1]  The amended agreement, which revised the long-standing definition of "refined sugar" used in prior agreements, created a blatant preference for one segment of the domestic industry over another segment, without any legitimate purpose.

It is undisputed that while conducting the renegotiation proceedings in *Sugar from Mexico*, high-ranking Commerce officials engaged in numerous *ex parte* meetings with domestic-industry representatives.  A disproportionate number of those meetings were with representatives from the industry segments that later received preferential treatment in the amended agreement, while CSC Sugar's interests were sidelined.  But Commerce did not create records of those meetings—a fact that became glaringly obvious after this Court

---

[1] *See infra* Rule 56.2(c) Statement.

ordered Commerce to produce any such records it had created, and Commerce was admittedly incapable of producing the necessary detailed description of the substance of those meetings and discussions.

By failing to create the statutorily-required record of *ex parte* meetings, Commerce both violated the Act and upended Congress's intent to ensure transparency in countervailing duty proceedings.  As a result of Commerce's failure, interested parties—including CSC Sugar—were entirely foreclosed from commenting on the *ex parte* meetings.  Commerce's error prejudiced CSC Sugar and was not harmless, because CSC Sugar's statutorily-protected interest in a fair process was irreparably injured.  Now, the Court is effectively precluded from exercising its lawful authority and conducting meaningful judicial review on the merits of Commerce's determination.

This Court should hold Commerce's violation of a clear statutory directive to be "not in accordance with law" and grant CSC Sugar's motion for judgment on the agency record.  Because Commerce's violation was not harmless error and infected the suspension agreement, the Court should vacate the agreement.

## RULE 56.2(c) STATEMENT

## I.    Administrative Determination Under Review

This action is an appeal from Commerce's final determination in *Sugar from Mexico: Amendment to the Agreement Suspending the Countervailing Duty Investigation*, 82 Fed. Reg. 31,942 (July 11, 2017) (P.R. 95) (the "suspension agreement").

## II.    Issues Presented

1.    Whether Commerce's failure to properly memorialize *ex parte* meetings, in violation of the Act and an implementing regulation, was not in accordance with law.

2.    Whether, because of Commerce's failure to memorialize *ex parte* meetings, the suspension agreement should be vacated.

## BACKGROUND

### A.    Commerce Amends the Countervailing Duty Suspension Agreement on *Sugar from Mexico*.

In 2014, after the American Sugar Coalition and its members filed a petition with Commerce and the U.S. International Trade Commission ("ITC"), the agencies investigated whether imports of sugar from Mexico were being subsidized and whether those imports were injurious to the domestic industry. (ECF No. 57 at 3; *Sugar from Mexico*, Inv. Nos. 701-TA-513 and 731-TA-1249 (Preliminary), USITC Pub. 4467, at 6 (May 2014).)  The ITC's preliminary determination stated that sugar with at least 99.5 degree polarity[2] was considered "refined sugar," and not "raw" or "other" sugar.  (*Sugar from Mexico*, Inv. Nos. 701-TA-513 and 731-TA-1249 (Preliminary), USITC Pub. 4467, at 6 (May 2014).)

Following the ITC's preliminary determination, Commerce determined that countervailable subsidies were being supplied to producers and exporters of sugar from Mexico.  (*See* ECF No. 57 at 3 (citing *Sugar from Mexico: Preliminary Affirmative Countervailing Determination and Alignment of Final*

---

[2] Polarity is the terminology in the industry used to describe the purity of the sugar.

*Countervailing Duty Determination with Final Antidumping Duty Determination*, 79 Fed. Reg. 51,956 (Sept. 2, 2014).)  Commerce's preliminary countervailing duty determination defined sugar at a polarity of 99.5 and above as "refined" sugar.  (P.R. 3.)

On December 19, 2014, Commerce and the Government of Mexico signed a suspension agreement.  (*See Sugar from Mexico: Suspension of Countervailing Duty Investigation*, 79 Fed. Reg. 78,044 (Dec. 29, 2014).)  The agreement defined "refined sugar" as sugar with a polarity of 99.5 and above.  (*Id.*)

Notwithstanding the suspension agreement, Commerce continued the investigation at the request of the domestic sugar industry and made a final determination.  (*See Sugar from Mexico: Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 57337 (Sept. 23, 2015).)  The definition of "refined sugar" in this final determination remained at 99.5 polarity.  (*Id.*)

Beginning in June 2016, Commerce and the Government of Mexico started negotiations regarding possible changes to the suspension agreement based on concerns raised by some domestic producers.  (*See* ECF No. 57 at 4 (citing *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 81 Fed. Reg. 6,832, 6,839 & fn.9 (Feb. 9, 2016).)

On June 16, 2017, Commerce and the Government of Mexico initialed draft suspension agreement amendments for the countervailing duty investigation. (*See* ECF No. 57 at 5.)  The amendments proposed, without a justified basis, that the definition of "refined sugar" be changed to 99.2 polarity, even though 99.5 polarity had been the definition since the

investigations began in 2014, and even though one member of the domestic industry, CSC Sugar, has a business model based on this established standard.[3]  (*See id.* at 5.)  The draft memorandum provided:  "These changes, which move the dividing line between Refined and Other Sugar down to 99.2 from 99.5 degrees and add shipping conditions for Other Sugar, *address the concern that a significant portion of Other Sugar is bypassing cane refiners* for direct consumption or end use."  (P.R. 73 at 4 (emphasis added).)  The draft memorandum on the same page made explicit that the changes were designed to give a competitive advantage to one segment of the domestic industry—the U.S. refiners of cane sugar—saying:

> {P}etitioner . . . has asserted that the sale of Mexican semi-refined sugar subject to the lower reference price of Other Sugar set in the original Agreement hinders the competitiveness of *the U.S. cane refiners* by diminishing the supply of Mexican sugar for their processing operations, supplanting their sales of refined sugar, and suppressing U.S. prices for refined sugar.

(*Id.* (emphasis added).)  Commerce repeated these explanations verbatim in its final memorandum.  (P.R. 103 at 4.)

It is Commerce's position that the change in the polarity-based definition of "refined sugar" was integral to the suspension agreement and critical for Commerce's objectives in *Sugar from Mexico*.  (*See* P.R. 73 at 4–6; P.R. 103 at 4–6)  Commerce stated that it believed it could not "guarantee" "crucial benefit{s}" to its favored segment of the domestic industry without the change.

---

[3] Other items were also modified but are not the subject of this appeal.

(P.R. 73 at 6; P.R. 103 at 6.)  The change, in reality, was a concession favoring certain domestic industry interests over others.

The contrast highlighted above—between some U.S. sugar refiners using lower-polarity sugar as input, on the one hand, and another U.S. sugar refiner (CSC Sugar) using higher-polarity sugar as input, on the other hand—is key to understanding how the new definition of "refined sugar" was designed to undermine CSC Sugar's business model.  Most sugar refineries built in the last twenty years, including CSC Sugar's, are designed to receive sugar with polarity of at least 99.00, and when put to use efficiently, those refineries require input with an even higher polarity.  (*See* Exhibit 1 of ECF No. 37)  Indeed, for these modern U.S. refineries, it is more economical to have most impurities removed at the originating mill *before* they receive it.  (*See id.*)  When they receive lower-polarity input, these modern refineries have much higher processing costs.  (*See id.*)  The American Sugar Coalition, by contrast, has refineries and equipment dating back over a century, when raw sugar was a lower quality as compared to today's standards.  (*See id.*)  Commerce's change to 99.2 polarity lowers the polarity of a large quantity of imports, making it easier to source lower-polarity input and much harder to source higher-polarity input throughout the year.  This, in turn, exponentially increases costs for modern U.S. refiners (such as CSC Sugar) while simultaneously reducing costs for older U.S. refiners (like the American Sugar Coalition).  (*See id.*)

The draft (and ultimately final) amended suspension agreement also provided that "other sugar"—that is, sugar that is not "refined sugar" and

hence of lower polarity—must be exported in bulk, freely flowing in ocean vessels.  (*See* 82 Fed. Reg. 31,942-3 (July 11, 2017).)  Transporting sugar this way makes it unfit for human consumption due to the possibility of contamination.  (*See* P.R. 73 at 5; P.R. 103 at 5.)  Stepping back for a moment, recall that Commerce in amending the suspension agreement sought to "address the concern that a significant portion of Other Sugar is bypassing cane refiners for direct consumption or end use." (P.R. 73 at 4.)  The in-bulk-freely-flowing requirement completely addresses Commerce's concern—and with that requirement in place, Commerce did not need to *also* change the polarity-based definition of "refined sugar."  Put another way, Commerce did not explain how the change in polarity furthered the goal of avoiding lower polarity sugar going into direct consumption, rather than simply undermining the business model of CSC Sugar and favoring other U.S. producer interests. It provided no rationale for how the new polarity requirement did anything but undermine the business model of one domestic competitor: CSC Sugar.

On August 10, 2017, CSC Sugar filed a summons in this appeal.  (ECF No. 1.)  On September 11, 2017, CSC Sugar filed its Complaint, alleging that Commerce's determination for the suspension agreement (i) was not supported by substantial evidence and was contrary to law because information required to be on the record had been omitted, and (ii) the definition and treatment of sugars (including refined and other sugars) was not supported by substantial evidence and was contrary to law.  (*See* ECF No. 11, ¶¶ 22–24.)

**B.      The Record Contains Documentation of Selective *Ex Parte* Meetings.**

On October 30, 2017, Commerce transmitted the administrative record and filed the index to the administrative record.  (*See* ECF No. 33.)  Commerce included a declaration representing that it provided a complete copy of the record for the countervailing duty investigation.  (ECF No. 33-4, ¶ 3.)  The declaration also represented that the index was a "complete list of the documents comprising the administrative record pertaining" to the suspension agreement.  (*Id.* ¶ 4.)

The record contains only three memoranda concerning *ex parte* meetings: (1) one with representatives of importers, (2) one with representatives from the Mexican government, and (3) one with counsel for CSC Sugar in 2018.  (*See* P.R. 76, 58, and 115.)

The above-referenced meeting with representatives of importers is reflected in a memorandum in the record of an *ex parte* call on June 16, 2017, between representatives of the Sugar Users Association and Commerce officials regarding "the draft amendments to the antidumping and countervailing duty suspension agreements on sugar from Mexico."  (P.R. 76 (*Sugar from Mexico: Ex-parte Memo* (June 21, 2017).)  The Commerce officials present included two Senior Policy Analysts from the Bilateral Agreements Unit, Enforcement & Compliance, an Assistant Chief Counsel from the Office of Chief Counsel for Trade Enforcement & Compliance, and a Staff Attorney from that same office. (*Id.*)  The Commerce officials at this meeting did not include the Secretary of Commerce or other high-level political appointees.  (*Id.*)

8

The meeting with representatives of the Mexican government is reflected in a short memorandum in the record of a meeting on March 9, 2017, between Secretary of Commerce Wilbur Ross and Mexican Secretary of Economy Ildefonso Guajardo Villarreal regarding sugar and the suspension agreement. (P.R. 58.)

The meeting with counsel for CSC Sugar is reflected in a memorandum in the record of a phone call on October 4, 2018, between the Director for Bilateral Agreements Sally C. Gannon, Commerce staff, and counsel to CSC Sugar, regarding CSC Sugar's submission of bracketed materials pursuant to Commerce memoranda.  (P.R.115.)

## C.     The Record Omits Documentation of Several Other *Ex Parte* Meetings.

Although Commerce officials participated in numerous other *ex parte* meetings during the course of the suspension agreement talks, these meetings are not memorialized in the record.  One example of such an *ex parte* meeting is referred to in an article from the *Financial Times* dated May 31, 2017—an article this Court has already taken judicial notice of.  (ECF No. 57 at 8; *see also* ECF No. 11, Ex. 1.)  The article notes that Secretary Ross had discussions with his Mexican counterparts and told them that he needed "just 15 minutes to seal the deal with {the} US industry." (ECF No. 11, Ex. 1 at 4.)  The article also reports that there was a subsequent phone call among Secretary Ross and domestic-industry representatives.  (*Id.* at 4–5.)  A spokesman for Secretary Ross disputed some of the details of the calls but did not dispute that they

occurred.  (*See id.*)  The record contains no *ex parte* memoranda documenting these calls.

The article also states, in referring to Mr. Jose "Pepe" Fanjul:

> Mr. Fanjul's role in the sugar talks has been entirely behind the scenes, according to sources close to the talks.  In recent weeks the sugar baron has visited Washington as part of the negotiations, according to one person close to the situation.  He and his son have also spoken multiple times to Mr. Ross by phone.

(*Id.* at 2.)

Mr. Fanjul controls Petitioner Florida Crystals Corporation along with his brother, Alfonso "Alfy" Fanjul Jr.[4]  No memoranda were put on the record regarding the substance of these multiple reported contacts.

Moreover, given the widely-reported social contacts between Secretary Ross and the Fanjuls,[5] it would not be surprising if there were also other meetings with Secretary Ross that addressed these agreements.

**D.     The Court Orders Commerce to Supplement the Record with Documentation of All *Ex Parte* Meetings, But Commerce Fails to Fully Comply with the Court's Order.**

In December 2017, CSC Sugar filed motions to complete the administrative record.  (ECF No. 36.)  In its Opinion & Order granting in part CSC Sugar's motion, the Court took judicial notice of the *Financial Times* article and recognized that Commerce does not "dispute that these ex parte

---

[4] (Company Overview of Florida Crystals Corporation, *available at* https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=787497.)

[5] (*See, e.g.*, "Sugar Talks May Hint at Trump Approach to U.S. Mexico Trade," N.Y. Times, June 4, 2017; "Flying South," Jan. 23, 2017, http://www.newyorksocialdiary.com/party-pictures/2017/flying-south; "Iconic shoots," Oct. 13, 2016, http://www.newyorksocialdiary.com/social-diary/2016/iconic-shoots; http://shinyshots.palmbeachdailynews.com/mycapture/enlargePopup.asp?iframe=1&image=60900950&event=2106523&CategoryID=48024&pSlideshow=1 (photo of Alex Fanjul and Wilbur Ross laughing together).)

calls occurred." (ECF No. 57 at 7–8.)[6] The Court found that "there exists a sufficiently reasonable basis to believe the record is incomplete," (*id.* at 8), and ordered Commerce to "supplement the administrative record on or before July 11, 2018 by filing with the court the record of any ex parte meeting," (*id.* at 22).

In response to the Court's orders, Commerce filed additional materials to supplement the record. (*See* ECF Nos. 67–73.) But none of the supplemental materials contained memoranda memorializing the *ex parte* meetings described in the *Financial Times* article. What is more, the materials Commerce submitted reveal and confirm that Commerce had numerous *ex parte* meetings. (*See generally id.*) Commerce's documents produced to the Court disclose that in the one-year period between June 2016 and June 2017, at least 41 meetings and phone calls took place between just Secretary Ross, Assistant Secretary for Enforcement & Compliance Paul Piquado, and/or Director of the Office of Policy and Strategic Planning Earl Comstock, and representatives of the domestic sugar industry. (*See* ECF Nos. 67-1, 67-2, 67-3, 72–74.) Although Commerce's documents show that these meetings took place, Commerce produced no memoranda memorializing these meetings (contemporaneously or subsequently) in the manner required, as further explained below. *See infra* Argument I. For example, emails between Secretary Ross and Mr. Fanjul confirm that *ex parte* meetings occurred, but do not include, among other things, (i) the time of those *ex parte* communications or (ii) a summary of the

---

[6] The Court also noted that Commerce's "actual recordkeeping" presented a conundrum: if Commerce memorialized and included in the record two (or three) *ex parte* meetings, why did it not also memorialize and include the *ex parte* meetings described in the *Financial Times* article? (*See* ECF No. 57 at 17–18.)

content of the discussions.  (See C.R. 17 at 124-127).  Indeed, Commerce admitted that, because of the time elapsed since the meetings, it could no longer "summarize the information that was presented or discussed during meetings and phone calls."  (P.R. 106).

Moreover, Commerce's supplemental documents indicate that Commerce may have had additional *ex parte* meetings that have not been revealed to the Court or the parties.  For example, during the tail end of negotiations in the spring of 2017, Mr. Fanjul [


]  (C.R. 23 at 12–13.)  Shortly thereafter, Commerce did, in fact, negotiate a change in polarity to 99.2.  (*See* ECF No. 57 at 4.)  And in June 2017, Director Comstock wrote to [

]

(C.R. 29 at 9.)  The record, however, does not reveal what meetings took place or with whom they occurred, *see infra* Argument I, that influenced Commerce to continue bargaining with Mexico for the change in polarity.

For the remainder of this brief, the *ex parte* meetings that occurred but were not memorialized—including the *ex parte* meetings described in the *Financial Times* article; the 41 meetings between Secretary Ross, Assistant Secretary Piquado, and/or Director Comstock, and representatives of the domestic sugar industry; and the possible other meetings—are referred to as the "Unmemorialized *Ex Parte* Meetings."

## ARGUMENT

The Act imposes an obligation on Commerce to create and maintain a record of all *ex parte* meetings related to a proceeding.  Here, Commerce failed to create and maintain records of *ex parte* meetings.  Commerce's failure runs contrary to the letter and the purpose of the Act, forecloses effective judicial review, and is not mere harmless error.  Particularly because CSC Sugar already exhausted its non-dispositive remedies when it moved to complete the record, the Court should now grant CSC Sugar's motion for judgment on the agency record and vacate the suspension agreement.

## I.   The Court Should "Hold Unlawful" the Suspension Agreement and Grant CSC Sugar's Motion, Because Commerce Acted "Not in Accordance with Law."

This action challenges the suspension agreement under the Act's judicial-review provision at 19 U.S.C. § 1516a(a)(2)(B)(iv).  (*See* ECF No. 11, ¶ 1.)  When a court reviewing Commerce's action under that provision concludes that Commerce's "determination, finding, or conclusion" is "unsupported by substantial evidence on the record, or otherwise not in accordance with law," then it "***shall*** hold unlawful" Commerce's action.  § 1516a(b)(1)(B)(i) (emphasis added).

Under § 1516a(a)(2), the Court reviews both the substantive merits and "procedural correctness" of Commerce's action.  *Valeo N. Am., Inc. v. United States*, 277 F. Supp. 3d 1361, 1365 (Ct. Int'l Trade 2017) (quoting *Miller & Co. v. United States*, 824 F.2d 961, 964 (Fed. Cir. 1987)).  Indeed, the Court "shall hold unlawful" Commerce's action as "not in accordance with law," §

1516a(b)(1)(B)(i), if "Commerce has conducted the administrative proceeding in a manner that is contrary to law," *Valeo N. Am.*, 277 F. Supp. 3d at 1365.

### A.   The Act Requires Commerce to Maintain a Record of All *Ex Parte* Meetings.

Using "clear and unambiguous" language, § 1516a(b)(2)(A)(i) requires that the record of a countervailing duty proceeding include "all information presented to or obtained by" Commerce during the proceeding.  (ECF No. 57 at 9–11); *see also* C.I.T. Rule 73.2(a).  Among other things, § 1516a(b)(2)(A)(i) expressly states that the record must include "all governmental memoranda pertaining to the case and the record of ex parte meetings required to be kept by section 1677f(a)(3)."  *See also* 19 C.F.R. § 351.104.

Section 1677f(a)(3), again using "clear and unambiguous" language, (ECF No. 57 at 11), imposes affirmative obligations on Commerce to create and maintain records of *ex parte* meetings:

> The administering authority and the Commission shall maintain a record of any ex parte meeting between—
>
> (A)   interested parties or other persons providing factual information in connection with a proceeding, and
>
> (B)   the person charged with making the determination, or any person charged with making a final recommendation to that person, in connection with that proceeding
>
> if information relating to that proceeding was presented or discussed at such meeting.

§ 1677f(a)(3).[7]  Commerce's obligation to maintain these records exists even if an adverse party has "made no objection to the absence of such a

---

[7] "Meetings" includes telephone calls.  *See generally F. Lli De Cecco Di Filippo Fara San Martino S.P.A. v. United States*, 980 F. Supp. 485, 489 (Ct. Int'l Trade 1997).

memorandum in the record," *Kao Hsing Chang Iron & Steel Corp. v. United States*, 140 F. Supp. 2d 1379, 1384 (Ct. Int'l Trade 2001) (citation omitted), and even if the records "will contain material that is . . . business proprietary, privileged, {or} classified," 19 C.F.R. § 351.104.

To satisfy its obligation, Commerce must maintain memoranda memorializing each *ex parte* meeting that includes "the identity of the persons present at the meeting, the date, time, and place of the meeting, and a summary of the matters discussed or submitted." § 1677f(a)(3). The memoranda must be included in the official "record of the proceeding," *id.*, and must be available for inspection and copying, *see* 19 C.F.R. § 351.104(b).

### B. When It Failed to Maintain a Record of All *Ex Parte* Meetings, Commerce Acted "Not in Accordance with Law."

In its Opinion & Order on CSC Sugar's motion to complete the administrative record, this Court ordered Commerce to supplement the record with memoranda of *ex parte* meetings. If it did so, Commerce would then satisfy its obligations under § 1516a(b)(2)(A)(i), which relates directly to record completeness. Although Commerce responded to the Court's order, it *did not* produce memoranda of the Unmemorialized *Ex Parte* Meetings, nor did it withhold them on grounds of privilege or other protections. This omission leads to one conclusion: Commerce never created memoranda memorializing those *ex parte* meetings in the first instance, and it is not reliably able to create the memoranda now. Commerce admitted this before the Court when it stated: "Commerce did not contemporaneously prepare memoranda summarizing ex parte meetings relating to the AD and CVD amendments." (P.R. 106.)

Commerce explains further that it is unable to produce such memoranda today, as "it is not possible to summarize the information that was presented or discussed during meetings and phone calls." (*Id.*)  When it failed to create and maintain a proper record of the Unmemorialized *Ex Parte* Meetings, Commerce violated its statutory obligation under § 1677f(a)(3) to "maintain a record of any ex parte meeting . . . ."

On multiple occasions, this Court has held that Commerce violated the Act by failing to maintain a record of *ex parte* meetings.  *See, e.g.*, *Nippon Steel Corp. v. United States*, 118 F. Supp. 2d 1366 (Ct. Int'l Trade 2000), *rev'd on other grounds*, 337 F.3d 1373 (Fed. Cir. 2003); *Kao Hsing*, 140 F. Supp. 2d 1379; *De Cecco*, 980 F. Supp. 485.  In *Nippon*, for example, Nippon sought to vacate an antidumping order because Commerce failed to make timely memoranda of its *ex parte* meetings with various domestic groups.  Summaries of the meetings made it clear that factual information "highly relevant to critical circumstances findings" had been conveyed.  118 F. Supp. 2d at 1373. While not disputing that the *ex parte* meetings occurred, Commerce argued in response that the information it obtained during those meetings was included in the record in some other manner, thus relieving it from its obligation under § 1677f(a)(3).  *Id.*  But the Court rejected this argument, reasoning that "Commerce is not entitled to choose which covered *ex parte* meetings it will memorialize, based on its own identification of redundancies."  *Id.*  Indeed, "{p}arties are entitled to know when and how information was conveyed; they should not have to rely on subtle judgments by Commerce officials or

employees about whether factual information is important, is already in the record in some other form, or is even useful to the agency or to the parties." *Id.* By neglecting to memorialize the meetings in the form required by statute, Commerce had violated the Act. *Id.* at 1373–74.[8]

Similarly in *Kao Hsing*, the plaintiff alleged that Commerce failed to include in the "administrative record a record of an ex parte meeting between Commerce officials and an interested party." 140 F. Supp. 2d at 1382. The Court agreed and held that "{b}oth section 1677f(a)(3), and the case law construing it, compel the conclusion that Commerce was required to make a memorandum of {an *ex parte*} meeting, and to include such memorandum in the record for review." *Id.*[9]

Here, like in *Nippon*, there is no dispute that the Unmemorialized *Ex Parte* Meetings actually occurred. (ECF No. 57 at 7–8); *see Nippon*, 118 F. Supp. 2d at 1372. This Court has, in addition, taken judicial notice of the *Financial Times* article. (ECF No. 57 at 8); *see Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.*, 761 F.2d 649, 657 (Fed. Cir. 1985) ("Issues decided

---

[8] In *Nippon*, despite finding that Commerce violated § 1677f(a)(3) by filing to maintain a record of *ex parte* meetings, the Court determined that Commerce's error was harmless, because the final critical circumstances decision was *actually in Nippon's favor*. 118 F. Supp. 2d at 1374 & n.7. The Court thus rejected Nippon's request to vacate the final determination. *Id.* Here, the situation is the opposite: Commerce's error was not harmless because Commerce's determination was not in CSC Sugar's favor and resulted in significant financial harm to CSC Sugar. *See also infra* Argument II.B.

[9] In *Kao Hsing*, the *ex parte* meetings at issue were between Commerce officials and counsel for the *plaintiff*. 140 F. Supp. 2d at 1380–81. Thus, the Court remedied Commerce's violation by ordering that the administrative record be supplemented with the plaintiff's proposed affidavits recounting the meetings. *Id.* at 1384. Such a remedy is not possible or meaningful here: CSC Sugar was harmed by Commerce's failure to maintain memoranda of *ex parte* meetings with *others*, and Commerce has admitted that it could no longer "summarize the information that was presented or discussed during meetings and phone calls." (P.R. 106.)

at an earlier stage of litigation, either explicitly or by necessary inference from the disposition, constitute the law of the case."). And this Court has already determined, at least implicitly, that these *ex parte* meetings were required to be documented and made part of the administrative record under § 1677f(a)(3). (*See generally* ECF No. 57.)

Moreover, tracing the statutory elements confirms that the Unmemorialized *Ex Parte* Meetings triggered Commerce's obligation to maintain a record. First, there can be no dispute that the omitted *ex parte* meetings fall under subsection (A) of § 1677f(a)(3), because the persons involved in those meetings, such as CSC Sugar or Mr. Fanjul, constitute "interested parties."

Second, under subsection (B) of § 1677f(a)(3), a record should have been made of the *ex parte* meetings because they would have involved Secretary Ross, "the person charged with making the determination." § 1677f(a)(3)(B). Meetings involving other Commerce officials also qualify under subsection (B) because individuals may have made "a final recommendation to" the person making the determination. *Id.* Even if those individuals may not have made final recommendations, multiple courts have explained that memoranda about *ex parte* meetings cannot be omitted from the record merely because they included lower-level Commerce officials. *See Kao Hsing*, 140 F. Supp. 2d at 1382 (noting that the "titles of agency officials" are irrelevant, and rejecting the "Government's argument that, in the absence of the Secretary, either the Assistant Secretary or Deputy Assistant Secretary must be present in order to trigger application of the statute. . . ."); *De Cecco*, 980 F. Supp. at 489 ("In

reality, unfair trade investigations are conducted by staff people at Commerce and not by the person making the final determination.").  Commerce cannot dispute that meetings with lower-level Commerce officials are relevant, as it included in the record summaries of other meetings with these individuals, such as Policy Analysts and a Staff Attorney.  *See De Cecco*, 980 F. Supp. at 489.

The meetings also satisfy § 1677f(a)(3), because "information relating to that proceeding was presented or discussed at such meeting."  § 1677f(a)(3).  The facts demonstrate that the meetings involved information relating to "the sugar talks" and "the negotiations."  (*See* ECF No. 11, Ex. 1; ECF No. 37 Ex. 3-4.)[10]  As in *Nippon*, "press reports" and other documentation make it clear that "factual information was conveyed," which was "highly relevant" to Commerce's findings and determination.  *Nippon*, 118 F. Supp. 2d at 1373 (citing §§ 1673b(e), 1673d(a)(3)).  Thus, the subject matter discussed at the *ex parte* meetings "clearly falls within the ambit of section 1677f(a)(3)."  *Kao Hsing*, 140 F. Supp. 2d at 1383.

In addition, as this Court has recognized in this case, Commerce's inclusion in the record of some *ex parte* meetings also highlights the glaring omission of other *ex parte* meetings.  (ECF No. 57 at 17–18); *see also De Cecco*, 980 F. Supp. at 489 (reasoning that where "{t}he record contains at least two summaries of *ex parte* meetings," additional "*ex parte* meeting memorand{a}

---

[10] It is irrelevant if non-Commerce officials initiated the *ex parte* meetings.  *See Kao Hsing*, 140 F. Supp. 23 at 1383 ("The statute, of course, makes no distinction with respect to which entity initiates contact.").

should have been placed in the record as it would have been consistent with Commerce's practice in this investigation"); *Kao Hsing*, 140 F. Supp. 2d 1383 (same).

Ultimately, by failing to create and maintain a proper record of the Unmemorialized *Ex Parte* Meetings, Commerce violated § 1677f(a)(3) and, as a result, § 1516a(b)(2)(A)(i) and 19 C.F.R. § 351.104.  Commerce thus "conducted the administrative proceeding in a manner that is contrary to law."  *Valeo N. Am.,* 277 F. Supp. 3d at 1365.  This impropriety means that the proceeding— and the resulting suspension agreement—are "not in accordance with law" under § 1516a(b)(1)(B)(i).  The Court "shall" therefore "hold unlawful" Commerce's determination.  § 1516a(b)(1)(B)(i).

## C.     Commerce's Actions Frustrated the Act's Purpose.

In addition to violating the letter of the Act, Commerce also frustrated the Act's purpose.  Congress intended that countervailing duty investigations be "transparent."  S. Rep. No 96-249, *Trade Agreements Act of 1979*, at 38, 41 (1979), *reprinted in* 1979 U.S.C.C.A.N. 424, 427.  When Congress amended the Act in 1979, it made "significant changes in existing law" to foster "greater transparency of investigations."  *Id.* at 38; *see also id.* at 41, 45.  To that end, §§ "1516a(b)(2), 1677f(a)(3), and 1671c(e) convey clear Congressional intent to require Commerce to maintain a complete record of suspension agreement proceedings and related determinations . . . ."  (ECF No. 57 at 9.)

Legislative history further confirms that the purpose of the 1979 amendments "was to ensure the 'maximum availability of information to

interested parties' so that 'all parties to the proceeding are more fully aware of the presentation of information' to Commerce." (*Id.* at 11 (quoting S. Rep. 96-249, *Trade Agreements Act of 1979*, at 100 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 486).)  "{E}nacted to guarantee broad access to information presented to the agency," (*id.* at 11–12), § 1677f(a)(3) ensures that "parties to the proceeding {are} able to inspect the memoranda so that they may comment on the factual data contained therein," *Nippon*, 118 F. Supp. 2d at 1373–74; *see Wieland–Werke AG v. United States,* 4 F. Supp. 2d 1207, 1212–13 (Ct. Int'l Trade 1998).

When Commerce violates § 1677f(a)(3) and fails to maintain memoranda contemporaneously, as it has done here, then a party—such as CSC Sugar— cannot possibly inspect or comment on those memoranda in a timely manner. *See* § 1516a(b)(2)(A)(i), 19 C.F.R. § 351.104.  Commerce's failure to maintain a proper record of the Unmemorialized *Ex Parte* Meetings violates § 1677f(a)(3)'s "guarantee" of "broad access to information presented to the agency," (ECF No. 57 at 11–12), and upends Congress's intent "to ensure the 'maximum availability of information to interested parties,'" (*id.* at 11 (quoting S. Rep. 96-249, *Trade Agreements Act of 1979*, at 100 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 486)).  With no memoranda describing the substance of those meetings, Commerce's investigation could never "serve procedural due process or the goal of transparency" underlying the Act.  *Nippon*, 118 F. Supp. 2d at 1374; *see also* S. Rep. No 96-249, *Trade Agreements Act of 1979*, at 38, 41 (1979), *reprinted in* 1979 U.S.C.C.A.N. 424, 427.

### D. Commerce's Actions Foreclose Effective Judicial Review.

Following proper procedure on the front end—which Commerce did not do—goes hand-in-glove with conducting meaningful review on the back end—which this Court now cannot do.  Without the statutorily-required record of the Unmemorialized *Ex Parte* Meetings, the "record is not complete enough to provide for meaningful review" of Commerce's determination on the suspension agreement and CSC Sugar's challenge to that determination.  *Hoogovens Staal BV v. U.S.*, 4 F. Supp. 2d 1213, 1219 (Ct. Int'l Trade 1998); *see also U.S. Lines, Inc. v. Fed. Mar. Comm'n*, 584 F.2d 519, 541 (D.C. Cir. 1978) (failure to disclose *ex parte* communications "forecloses effective judicial review").

Commerce's failure stymies this Court's ability to exercise its authority.  Not only does CSC Sugar not know what was exchanged in the Unmemorialized *Ex Parte* Meetings, but this Court on review does not know, either.  How, then, could the Court ever meaningfully evaluate Commerce's determinations on the merits?  Indeed, Commerce's "secrecy stands between" the Court and its "fulfillment of {its} obligation" under § 1516a(a)(2).  *Home Box Office, Inc. v. F.C.C.*, 567 F.2d 9, 54 (D.C. Cir. 1977).  "{W}here, as here, an agency justifies its actions by reference only to information in the public file while failing to disclose the substance of other relevant information that has been presented to it, a reviewing court cannot presume that the agency has acted properly, but must treat the agency's justifications as a fictional account of the actual decisionmaking process and must perforce find its actions arbitrary."  *Id.* at 54–55.

In sum, Commerce's actions were "not in accordance with," § 1516a(b)(1)(B)(i), either the letter or the spirit of the Act or its implementing regulation, §§ 1516a(b)(2)(A)(i), 1677f(a)(3); 19 C.F.R. § 351.104. And Commerce's actions foreclose effective judicial review, thereby interfering with the Court's functioning. For these reasons, the Court should hold Commerce's actions—and the suspension agreement they infected—"unlawful" and grant CSC Sugar's motion for judgment on the agency record. *Id.*; C.I.T. Rule 56.2.

## II.     As a Remedy, the Court Should Vacate the Suspension Agreement.

When the Court concludes that Commerce has violated a statute or regulation, it applies the following framework to select an appropriate remedy. First, the Court considers whether the applicable statute or regulation "spells out a remedy for failure to comply." *Guangdong Chemicals Imp. & Exp. Corp. v. United States*, 414 F. Supp. 2d 1300, 1309 (Ct. Int'l Trade 2006). "[I]f no remedy is stated," then the Court next considers whether the law is "intended to provide important procedural benefits." *Id.* If the law is intended to provide important procedural benefits, then the Court must "void the agency action unless the agency demonstrates that the violation was harmless error." *Id.*

### A.     Because the Relevant Statutes and Regulation Are "Intended to Provide Important Procedural Benefits," the Court Must Vacate the Suspension Agreement Unless Commerce Shows Its Error Was Harmless.

Separately and together, § 1516a(b)(2)(A)(i), § 1677f(a)(3), and 19 C.F.R. § 351.104 are "intended to provide important procedural benefits." *Guangdong Chemicals*, 414 F. Supp. 2d at 1309. As described above, these laws are intended to ensure transparency and fair process. *See supra* Argument I.C.

This Court has on multiple occasions provided relief to parties harmed by Commerce's violation of these laws.  *See supra* Argument I.B.  Indeed, if Commerce shirks its duties under these laws, both the administrative process and judicial review of that process become compromised.  *See supra* Arguments I.C, I.D; *see infra* Argument II.B.

Because these laws are intended to provide important procedural benefits, the Court must "void {Commerce's} action unless {Commerce} demonstrates that the violation was harmless error."  *Guangdong Chemicals*, 414 F. Supp. 2d at 1309; *see also Portland Audubon Soc. v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir. 1993) ("{W}here the so-called 'record' looks complete on its face . . . but there is a subsequent showing of impropriety in the process, that impropriety creates an appearance of irregularity which the agency must then show to be harmless.").  That is, Commerce bears the burden of proving that its violation was harmless error.  As explained below, Commerce cannot possibly satisfy this burden.  *See infra* Argument II.B.

What is more, vacatur—voiding Commerce's action and setting aside the suspension agreement—is the only appropriate remedy at this stage in the case.  CSC Sugar already exhausted its non-dispositive option when it filed and prevailed on a motion to complete the record.  But that motion did not result in compliance with the Act.  Perhaps this should not come as a surprise, because "agencies, left to themselves, have a built-in incentive not to create records of unpopular decisions or, less nefariously, just do not think about preserving

information necessary to protect the legal and financial rights . . . of persons directly affected by the agency's activities." *Citizens for Responsibility & Ethics in Washington v. Pruitt*, 319 F. Supp. 3d 252, 259–60 (D.D.C. 2018) (quoting *Am. Friends Serv. Comm. v. Webster*, 720 F.2d 29, 41 (D.C. Cir. 1983)).

Now, further remedial action is required.  What other options does the Court have to provide meaningful relief to CSC Sugar, other than vacatur of the suspension agreement in its entirety?[11] Any other remedy, such as requiring Commerce to place something on the record "after all decision-making is complete," would be "useless and disrespectful of the administrative process, as well as violative of the statute." *Nippon*, 118 F. Supp. 2d at 1373; *cf. Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110–11 (D.C. Cir. 2014) (affirming remedy of vacatur when agency committed "fundamental flaw" of "deficient notice").[12]  Commerce, in fact, has admitted that it could no longer "summarize the information that was presented or discussed during meetings and phone calls."  (P.R. 106.)

---

[11] As explained above, the change in the polarity-based definition of "refined sugar" was integral to the suspension agreement and critical for Commerce's objectives in *Sugar from Mexico.  See supra* Background A.

[12] Although the Administrative Procedure Act does not govern the action here, APA cases can be analogous and persuasive, especially given how the Act and the APA contain similar judicial-review provisions.  *Compare* § 1516a(b)(1)(B)(i) ("The court shall hold unlawful any determination, finding, or conclusion found  . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . .") *with* 5 U.S.C. § 706(2) ("The reviewing court shall hold unlawful and set aside agency action, findings and conclusions found to be . . . otherwise not in accordance with law . . . {or} unsupported by substantial evidence . . . .").  *See generally Mid Continent Nail Corp. v. United States*, 846 F.3d 1364 (Fed. Cir. 2017) (analyzing actions of Commerce under the Act and the APA).

**B.     Commerce Cannot Show that Its Error Was Harmless.**

Even though Commerce bears the burden of proving harmless error, *see supra* Argument II.A, CSC Sugar takes the opportunity here to explain why Commerce cannot possibly meet that burden.

Foreclosing the opportunity to comment amounts to a "complete failure"—not a mere "technical" defect—that courts almost never hold to be harmless error. *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1383-84 (Fed. Cir. 2017).  In the APA context, for example, when Commerce "utter{ly} fail{s} to comply with notice and comment," that error "cannot be considered harmless if there is any uncertainty at all as to the effect of that failure." *Id.* (quoting *Sugar Cane Growers Co–op. of Fla. v. Veneman*, 289 F.3d 89, 96 (D.C. Cir. 2002)).[13]  Recently in *Linyi Bonn Flooring Mfg. Co. v. United States*, this Court held that Commerce's procedural violation was not harmless error because the violation was "a consequential one in that it not only had the potential to affect the outcome of the review proceeding but also prejudiced" the plaintiff.  222 F. Supp. 3d 1274, 1289 (Ct. Int'l Trade 2017).  In short, prejudicial error—error that is not harmless—means "injury to an interest that the statute, regulation, or rule in question was designed to protect." *Id.* (quoting *Intercargo Ins. Co. v. United States*, 83 F.3d 391, 396 (Fed. Cir. 1996)).

Commerce's violation of the Act and the implementing regulation presents a classic case of prejudicial error.  The Act was "designed to protect" a

---

[13] Technical violations (resulting in harmless error), by contrast, do not preclude the plaintiff from having a meaningful opportunity to comment. *See, e.g.*, *Mid Continent Nail*, 846 F.3d at 1384.

party to a proceeding's interest in having "maximum availability of information"

so as to be "more fully aware of" the information Commerce possesses and is

considering.  (ECF No. 57 at 11 (quoting S. Rep. 96-249, *Trade Agreements Act*

*of 1979*, at 100 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 486)); *see supra*

Argument I.C.  Intended to provide "greater transparency" in investigations, S.

Rep. No 96-249, *Trade Agreements Act of 1979*, at 38 (1979), *reprinted in* 1979

U.S.C.C.A.N. 424, the relevant sections of the Act—including §§

1516a(b)(2)(A)(i) and 1677f(a)(3), as well as 19 C.F.R. § 351.104—"require

Commerce to maintain a complete record of suspension agreement proceedings

and related determinations," (ECF No. 57 at 9), so that "parties to the

proceeding {are} able to inspect the memoranda so that they may comment on

the factual data contained therein," *Nippon*, 118 F. Supp. 2d at 1373–74; *see*

*Wieland–Werke,* 4 F. Supp. 2d at 1212–13.

By violating § 1677f(a)(3) when it failed to maintain memoranda of *ex*

*parte* meetings, and by violating § 1516a(b)(2)(A)(i) and 19 C.F.R. § 351.104

when it failed to make and disclose a proper record, Commerce completely

foreclosed any opportunity to inspect or comment on those memoranda.

Commerce's violation injured CSC Sugar's statutorily-protected interest in

being able to "inspect the memoranda so that they may comment on the factual

data contained therein," *Nippon*, 118 F. Supp. 2d at 1373–74, and it directly

contravened the Act's intent to protect CSC Sugar's interest in having

"maximum availability of information" so as to be "more fully aware of" the

information Commerce possesses and is considering as part of the

investigation.  (ECF No. 57 at 11 (quoting S. Rep. 96-249, *Trade Agreements Act of 1979*, at 100 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 486)).)

Just like in *Linyi Bonn*, Commerce's failure had "the potential to affect the outcome of the review proceeding" and "also prejudiced" CSC Sugar.  222 F. Supp. 3d at 1289.  Uncertainty abounds as to what would have happened with the suspension agreement had CSC Sugar and other interested parties had an opportunity to inspect and comment on records of the Unmemorialized *Ex Parte* Meetings.  It is impossible to know now how interested parties, including CSC Sugar, would have commented on Secretary Ross's *ex parte* meetings "to seal the deal with {the} US industry," (ECF No. 11, Ex. 1 at 4), or on the "multiple" meetings between Ross and Mr. Fanjul and his son, (*id.* at 2).  By failing to maintain and disclose the required records, Commerce denied CSC Sugar its right to meaningfully participate in the administrative process.  For that reason, even if the details of those *ex parte* meetings were disclosed *now*, which Commerce admits it cannot do, (P.R. 106), that would not vindicate CSC Sugar's right to participate in the process *while the process is ongoing*.  *See, e.g.*, *Linyi Bonn*, 222 F. Supp. 3d at 1291 ("{T}he only remedy that will suffice is one that affords Linyi Bonn the opportunity it would have had if" Commerce's violation "had not occurred" in the first instance.).  As an ultimate result, this Court is now precluded from conducting effective judicial review.  *See supra* Argument I.D.

In sum, Commerce's failure to maintain and disclose a record of *ex parte* communications, in violation of—and "not in accordance with"— §§

1516a(b)(2)(A)(i), 1677f(a)(3), and 19 C.F.R. § 351.104 prejudiced CSC Sugar. Even though the burden to show harmless error rests on Commerce, it is clear that the error here was substantially prejudicial and not harmless: it precluded CSC Sugar from being able to inspect and comment on information obtained by Commerce, and it "foreclose{d} effective judicial review" of Commerce's determination, *U.S. Lines*, 584 F.2d at 541, thereby irreparably denying CSC Sugar fair process and frustrating this Court's ability to exercise its authority.

## CONCLUSION

The Court should grant CSC Sugar's motion for judgment on the agency record and vacate the suspension agreement.

Dated this 18 day of January, 2019.

HUSCH BLACKWELL LLP
Attorneys for CSC Sugar LLC


By: _____
Jeffrey S. Neeley
Michael Klebanov

P.O. ADDRESS:
750 17th St. N.W.
Suite 900
Washington, D.C. 20006-4675
202.378.2300
202.378.2319 (fax)
jeffrey.neeley@huschblackwell.com
michael.klebanov@huschblackwell.com

## CERTIFICATE OF COMPLIANCE

This brief conforms to the Chambers Procedures word count limitation.

The length of this brief is 7,517 words.

_____
Jeffrey S. Neeley

**CERTIFICATE OF SERVICE**

A true and accurate copy of the foregoing was electronically filed on

January 18, 2019, via the Court's ECF filing system, which automatically

serves notice on counsel of record.

                                        _____

                                        Jeffrey S. Neeley